IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| v. | § | Case No. 4:10-CR-234 |
| | § | |
| | § | |
| ANDREW AYALA | § | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO SUPPRESS**

This matter having been referred by the Honorable Richard A. Schell, the Court has considered Defendant's Motion to Suppress (Dkt. 18). After considering the evidence presented and the arguments of counsel at the hearing held on March 29, 2011, the Court finds that the motion should be GRANTED in part and DENIED in part.

Defendant Andrew Ayala is charged in this matter with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §924(c). He is also charged with possession with intent to distribute marijuana in violation of 21 U.S.C. §841(a)(1).

In his motion, Defendant seeks to suppress all oral statements made to law enforcement on or after September 12, 2010, as well as any weapons, illegal drugs, cash, scales, drug paraphernalia, or other evidence seized or acquired during the search of his home as a result of his statements or acts. Defendant claims that the statements were improperly obtained during a custodial interrogation, without advising him of his *Miranda* rights in violation of his Fifth Amendment rights. In addition, Defendant claims that his home was unlawfully entered and searched without probable

1

cause, exigent circumstances, or a warrant in violation of the Fourth Amendment. Defendant claims that admission of these statements, acts, and the seized and derivative evidence would violate the Sixth and Fourteenth Amendments.

In short, Defendant's brush with the law resulted from reports of a woman's terrifying and troubling screams emanating from his apartment. Unknown to his neighbors or the responding police officers, the screams were actually those of the Defendant caught up in the excitement and drama of a Dallas Cowboy football game. At the hearing, the Government offered the audio recordings of two domestic disturbance calls placed to 911 by Defendant's neighbors, testimony of McKinney Police Department Officers Tracy Rimpel and Travis Ray, who responded to the 911 calls, as well as the video and audio recordings from both officers' police cruiser cameras.

## Factual Background

According to the evidence presented[1], the McKinney Police Department received two 911 calls on September 12, 2010, stating a domestic disturbance was in progress at 600 S. Graves, #1506, McKinney, Texas. Dkt. 23 at 1. In the first 911 call, placed at 7:48 p.m., the caller informs the dispatcher that there is a "one-year-old baby" in the apartment. In the second 911 call, placed at 7:53 p.m., the caller informs the dispatcher that someone is being "beaten in her apartment" and that someone was "screaming bloody murder." In his testimony before the Court, Officer Rimpel said the dispatcher told him there was a "domestic disturbance in progress — a man beating a woman."

---

[1] Unless otherwise indicated, the facts are taken from the 911 audio recordings, Government Exhibit 1, and the audio and video recordings from the cruisers and body microphones of Officer Rimpel, Government Exhibits 2 and 3, and Officer Ray, Government Exhibits 4 and 5. The recordings contain time stamps which indicate the time of the events.

Upon the officers' arrival, they encountered a female neighbor who, according to Officer Ray's testimony, was "going nuts" because she believed an assault was in progress between a young couple with a child.² Ex. 5 at 2, ll. 4-6. Officer Ray testified that he did not know the neighbor and that she never told him what she heard to make her believe there was an actual assault, although he believes she indicated that she had heard the couple fighting before. According to his testimony, Officer Ray arrived on the scene about 30 seconds after Officer Rimpel and they spoke with the neighbor only about as long as it took for them to walk from Officer Ray's car to the apartment.

The neighbor directed the officers to the bottom of the stairs leading up to Apt. 1506. Officer Rimpel testified that the blinds to the balcony were closed and, from their position at the bottom of the stairs, the officers could not see into the apartment. The officers claim the blinds on the window facing the door appeared to be damaged as a result of an altercation. While standing at the base of the stairwell, the officers heard a scream that, according to Officer Ray's testimony, lasted 1-1½ seconds. Officer Ray described the scream as that of an adult female "experiencing extreme pain," adding that "thinking about it now sort of makes your hair stand up." After the officers heard the scream, Officer Ray asked "Did you hear that?" and the officers ran to the top of the stairs.

The officers believed an assault was occurring and thus proceeded to kick open the apartment door and enter the residence. After the officers entered the apartment, they discovered that the scream came not from an assault victim, but from Defendant who was "enthusiastically watching a Dallas Cowboys Sunday night football game" with his daughter. Dkt. 18 at 1, par.1. However, Officer Rimpel testified that the scream he and Officer Ray heard was "an in-fear scream" and that "it wasn't a 'Wow, the Dallas Cowboys won a game' scream." In his testimony, Officer Ray

---

² Officer Rimpel also testified that he believed that there was a child in the apartment.

explained that they entered the apartment with no planning because "we both knew immediately what we had to do." Officer Ray continued, explaining that "we're taught that there is no average domestic call" and it has been his experience "that you don't have time to knock and announce" and "you must act." Although the only scream the officers heard was that from the base of the stairwell, Officer Rimpel defended the decision to kick the door in, stating "I would do it again tomorrow."

When Officers Rimpel and Ray entered the apartment with their weapons drawn, they both announced "McKinney Police" and told Defendant to "[g]et down." Ex. 5 at 2, ll.14-18. Officer Ray then stated "I gotcha. I gotcha. I got him. I got him." Defendant stated "Okay. I'm sorry." Ex. 5 at 2, ll.19-21. When Officer Ray then asked Defendant "Who's here?," Defendant replied "Nobody. The baby." Ex. 5 at 2, ll.23-24. Officer Ray then stated "Put your hands behind your back" and "10-4, taking one in custody." Ex. 5 at 2, l.25; 3, l.2. Officer Rimpel said "Don't move," to which Defendant replied "I'm not. I'm not. I'm not." Ex. 5 at 3 ll.3, 5.

According to the testimony of Officer Ray, he handcuffed the Defendant when Defendant got on the ground, while Officer Rimpel "clean[ed] the remainder of the apartment" looking for the suspected domestic assault victim, stating "Ma'am, McKinney Police." Ex. 5 at 3, l.6. Officer Rimpel testified that when he entered Defendant's apartment he checked the bathroom, the bedroom, and the bedroom closet, but found no one. According to his testimony, Officer Rimpel suspects it took about 1-2 minutes to realize there was no assault taking place. Officer Ray testified that Officer Rimpel's sweep lasted "a second or two." At this point, Officer Ray testified that he could have secured Defendant's 17-month-old child and, indeed, Officer Rimpel is heard saying "It's okay. It's okay." to the child on Officer Ray's audio recording. Ex. 5 at 3, ll.11-12.

4

After Officer Rimpel returned from his protective sweep and reassured Defendant's child, Officer Ray asked Defendant his name, told Defendant he could "hear someone screaming from outside," and asked Defendant where the child's mother was. Ex. 5 at 3, ll.13-20. Defendant stated his name, stated that he "was just playing around," and stated that the child's mother was at work. Ex. 5 at 3, ll.14-21. Officer Ray asked Defendant "Are you the one screaming?" to which Defendant replied "Yeah, it was me." Ex. 5 at 3, ll.22-24. Defendant apologized again, saying "I'm sorry" and that "it was nothing." Ex. 5 at 4, ll.2-3. At this point, Officer Ray interrupted Defendant and asked where the television controller was. Ex. 5 at 4, l.4. Officer Ray stated "start over," and the television volume was turned down. Ex.5 at 4, ll.5-6.

After the television volume was turned down, Defendant again stated "It was nothing, sir. I'm sorry." Ex. 5 at 4, ll.6-7. The Officers continued their conversation with Defendant, explaining that they thought "there was a woman being beaten up" and asking Defendant why he was "screaming and hollering and making people think that someone is being hurt." Ex. 5 at 4, ll.8-23. Defendant responded to the remarks by continuing to say he was "sorry," explaining that "it was a surprise to me when you guys kicked the door in," stating that "my wife is at work" and that it was "nothing." Ex. 5 at 4, ll.11-25. Officer Ray asked "what's the point of this?" to which Defendant replied "It's not really a point. I'm just watching the game." Ex. 5 at 5, ll.2-4. Officer Ray replied "Okay." and Defendant again stated he was "sorry" and that it was "nothing." Ex. 5 at 5, ll.5-6.

Officer Ray also discussed drugs with Defendant, asking if he was high and inquiring as to "the last time [Defendant] smoked." Ex. 5 at 5, ll.7, 19-20. During this exchange, Officer Rimpel informed the dispatcher "We came up to the front door, heard screaming, had to make forced entry. It's going to be a male with his daughter." Ex. 3 at 2, ll.14-16. Officer Rimpel then asked Defendant

5

"So your pipe's up here on the counter, what's that all about? It's got residue all over here." Ex. 3 at 3, ll.4-6; Ex. 5 at 5, ll.23-24. Officer Ray told Defendant "it's cool, if you're going to blame that on the Cowboys playing, and you're excited, then that's fine. You ain't the only one in town...." Ex. 3 at 3, ll.8-10; Ex. 5 at 6, ll.1-3. Officer Rimpel then added "But you probably need to do it when you got somebody to take care of your kid," and Officer Ray agreed. Ex. 3 at 3, ll.11-13; Ex. 5 at 6, ll.4-6.

The following is a transcript of what was then said:

| | |
|---|---|
| Officer Rimpel: | Oh. |
| Officer Ray: | How about that. |
| Officer Rimpel: | Oh-ho. |
| Officer Ray: | How about that. |
| Officer Rimpel: | All your little baggies in here, your scales and all your weed. What's your name, man? |

Ex. 3 at 3, ll.14-19; Ex. 5 at 6, ll.7-12. Defendant again stated his name and Officer Ray asked where a light switch was. Ex. 3 at 3, ll.20-25; Ex. 5 at 6, ll.13-18.

The officers then asked Defendant whether he had "any weapons in the house" three times in a row, to which Defendant replied "Yeah." Ex. 3 at 4, ll.4-10; Ex. 5 at 6, ll.22-25, 7, ll.1-3. Officer Ray asked "What you got?," said "Watch the little girl." and then explained "We just want to know for our own safety." Ex. 3 at 4, ll.11-15; Ex. 5 at 7, ll.4-8. Officer Ray again asked what Defendant had "in the house," Defendant replied that he had a pistol, and Officer Rimpel asked Defendant where the pistol was twice, explaining that "you got a little girl roaming around the house, right. We want to make sure everything's all right." Ex. 3 at 5, ll.4-6. Officer Ray then said "we

6

don't want her to get ahold—" and Defendant interrupted, stating that "It's in a safe place and she can't get it." Ex. 3 at 5, ll.7-10; Ex. 5 at 8, ll.6-9. Officer Rimpel replied, saying "Okay. Where is it at because we're going to secure it?" Ex. 3 at 5, ll.11-12. When Defendant indicated the drawer in which the pistol was located, Officer Rimpel commented "That's certainly not a safe place," to which Defendant replied "I know, but it's not loaded or anything, but I'm pretty sure it's stolen, because I got it off somebody. I don't know. I didn't use it or anything. Sorry [. . .]. Nobody got hurt in here or anything." Ex. 3 at 5, ll.13-22.

The Officers and Defendant continued to discuss the "misunderstanding," the location of Defendant's child's mother, and whether Defendant had a driver license. Ex. 3 at 6, ll.1-10; Ex. 5 at 9, ll.1-10. When Defendant explained he could not locate his driver license, Officer Rimpel asked Defendant for his full name and *Mirandized* Defendant.

## AUTHORITIES & ANALYSIS

### *Exigent Circumstances*

Defendant claims that he did not intelligently, knowingly, and voluntarily consent to the officers entering his residence and there were no exigent circumstances or probable cause to justify the officers doing so without a warrant. Defendant claims the warrantless entry into his apartment violated his Fourth Amendment rights.

A warrantless intrusion into an individual's home is presumptively unreasonable unless the person consents or probable cause and exigent circumstances justify the encroachment. *United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001); *see also United States v. Rodea*, 102 F.3d 1401, 1404 (5th Cir. 1996). The exigent circumstances exception applies where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence,

outweigh the reasons for prior recourse to a neutral magistrate. *United States v. Rodea*, 102 F.3d 1401, 1404 (5th Cir. 1996). Such circumstances may exist if law enforcement officers reasonably fear for their safety or if firearms are present, or if officers need to assist persons who are seriously injured or threatened with serious injury. *United States v. Flores-Castaneda*, 384 Fed. Appx. 364, 367 (5th Cir. 2010) (internal citations omitted).

There is no set formula for determining when exigent circumstances will justify a warrantless entry, however, courts consider, among other factors: (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) the information indicating that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of it and to escape are characteristics in which those trafficking in contraband generally engage. *Id.* (internal quotations and citations omitted).

When evaluating exigency, courts should consider the appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers. *United States v. Lewis*, 381 Fed. Appx. 376, 381 (5th Cir. 2010) (quoting *United States v. Blount*, 123 F.3d 831, 838 (5th Cir. 1997)) (internal quotation marks omitted). If reasonable minds may differ, a court should not second guess the judgment of experienced law enforcement offices concerning the risks of a particular situation. *Id.*

In the case before the Court, the officers' warrantless and unannounced entry into Defendant's home was justified by a reasonable belief that there was an assault in progress and that someone might be in need of assistance. *See United States v. Flores-Castaneda*, 384 Fed. Appx.

364, 367 (5th Cir. 2010); *see also United States v. Rodriguez*, 601 F.3d 402, 408 (5th Cir. 2010) (holding that "domestic disputes often involve high emotions and can quickly escalate to violence"). Officers Rimpel and Ray testified that they based this belief on the report from the dispatcher, the report from the neighbor, the scream heard from the base of the stairwell, and the damaged blinds in the window of Defendant's apartment. Both officers believed there was a high degree of urgency and that a female victim required immediate assistance. Even if reasonable minds may differ as to whether the evidence presented is enough to justify the belief that an assault was in progress, Officer Rimpel testified that he "would do it again tomorrow" and this Court will not second guess this decision to render aid.

Therefore, the Court finds that Defendant's Motion to Suppress statements and evidence pursuant to the Fourth Amendment based on a warrantless entry should be DENIED.

### *Protective Sweep*

Defendant has also argued that the officers had no reasonable articulable suspicion to conduct a protective sweep and that the officers' protective sweep exceeded the statutory bounds of what is considered reasonable both in length and breadth. Defendant claims this protective sweep violated his Fourth Amendment rights.

The protective sweep doctrine allows government agents, without a warrant, to conduct a quick and limited search of premises for the safety of the agents and others present at the scene. *United States v. Rodriguez*, 601 F.3d 402, 405 (5th Cir. 2010). To be constitutionally valid, (1) the police must not have entered (or remained in) the home illegally and their presence within it must be for a legitimate law enforcement purpose; (2) the protective sweep must be supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to

those on the scene; (3) the legitimate protective sweep may not be a full search but may be no more than a cursory inspection of those spaces where a person may be found; and (4) the protective sweep may last no longer than is necessary to dispel the reasonable suspicion of danger, and no longer than the police are justified in remaining on the premises. *Id.* at 405-06. A court should consider the totality of the circumstances surrounding the officers' actions in determining whether an officer had a reasonable, articulable suspicion sufficient to justify a protective sweep. *Id.* at 406.

The officers in the present case satisfy, at most, only the first three elements listed by the court in *Rodriguez*. As discussed above, exigent circumstances justified the officers' warrantless entry into Defendant's home, thus satisfying the first element. As for the third element, Officer Rimpel testified that he searched only the bathroom, the bedroom, and the bedroom closet before returning to Officer Ray and Defendant.

The second element states that officers may conduct a protective sweep if they believe there are hidden individuals who pose a danger to those on the scene. *See id.* (holding protective sweep was justified when officers responded to 911 domestic disturbance call, were aware of a previous domestic disturbance call at the residence from the year before, found children in the residence who were not reported by the callers or dispatcher, and were aware of the alleged presence of a firearm in the residence); *United States v. Getachew*, 364 Fed. Appx. 931, 933 (5th Cir. 2010) (holding protective sweep was justified when officers arrived within minutes of being dispatched to a robbery in progress, were told a victim had seen men inside the house with guns, and did not know whether other suspects were still in the house). In the present case, the Government argues that the protective sweep was necessary to locate the suspected assault victim, as officers believed they had heard a woman screaming and found only Defendant and his infant daughter when they entered the

apartment. While a possible hidden victim poses no threat to an officer or other individual on the scene, the officers acted in good faith and had a reasonable articulable suspicion that someone in the apartment may still be in need of assistance. Therefore, the Court believes this is enough to satisfy the second element.

At this point, however, any justification for a protective sweep ended. The fourth element states that the protective sweep may last no longer than is necessary to dispel the reasonable suspicion of danger, and no longer than the police are justified in remaining on the premises. In this case, any suspicion of danger was dispelled as soon as the officers had Defendant in handcuffs. Once the officers realized there was no assault taking place — a realization that took only a few minutes according to Officer Rimpel — there was no further reason for any sweep to continue. Defendant's illegal drugs, cash, scales, and drug paraphernalia were all in plain view on the counter where Defendant was arrested. Therefore, they were properly seized. *See Rodriguez*, 601 F.3d at 407 (explaining that, in conjunction with the protective sweep doctrine, the plain view exception allows police to seize items where: (1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was immediately apparent; and (4) the police had a lawful right of access to the item).

However, there was no evidence in plain view of the presence of a firearm and both officers testified that they were not aware of any alleged presence of a firearm. The gun was only found after officers questioned Defendant, Defendant indicated its location and officers found it in a closed drawer. The Court finds that such discovery exceeded the scope of any protective sweep.

The court in *United States v. Getachew*, 364 Fed. Appx. 931, 933 (5th Cir. 2010) held that a reasonable suspicion of danger justified a protective sweep, but that officers exceeded the scope

of the protective sweep by opening a kitchen drawer and thereby observing a firearm. However, the court held that the district court "did not err in determining that the firearm was nevertheless admissible under the independent-source exception to the exclusionary rule." *Id.* The independent-source exception "dictates that evidence obtained from an illegal search is admissible if the same evidence was also obtained from a lawful source independent of the illegality." *United States v. Runyan*, 290 F.3d 223, 235 (5th Cir. 2002). In *Getachew*, the officers executed a warrant "based on the responding Officers' plain-view observations of scales and marijuana residue, as well as the very strong marijuana odor in the residence" and "there was no reference to the firearm in the affidavit supporting the search warrant." *Getachew*, 364 Fed. Appx. at 933-34. The *Getachew* court notes that the "Government therefore established: the Officers would have sought a warrant in the absence of the illegal search; and, the warrant would still have been issued because it was supported by ample probable cause." 364 Fed. Appx. at 934. In the present case, the officers never sought a search warrant and thus have no claim or redress under the independent-source doctrine.

In light of these authorities, the Court finds that Defendant's Motion to Suppress the illegal drugs, cash, scales, and drug paraphernalia should be DENIED as they were in plain view during the protective sweep but that Defendant's Motion to Suppress the weapon should be GRANTED because it was not lawfully within the scope of the protective sweep and not otherwise discoverable under the independent-source rule.

## *Miranda*

The Court also finds that Defendant's statements to officers about the location and origins of the weapon were improperly obtained during a custodial interrogation and that officers failed to first inform Defendant of his *Miranda* rights in violation of the Fifth Amendment. In order to

preserve the Fifth Amendment privilege against self-incrimination, law enforcement officials must inform a suspect in custody of his right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to retained or appointed counsel. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct 1602, 16 L. Ed. 2d 694 (1966). Statements obtained during a custodial interrogation without providing adequate warnings under *Miranda* are generally inadmissible. *Missouri v. Seibert*, 542 U.S. 600, 608, 124 S. Ct. 2601, 159 L. Ed.2d 643 (2004). A person not formally arrested is deemed to be in custody when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. *United States v. McLean*, 369 Fed. Appx. 536, 537 (5th Cir. 2010) (quoting *United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006)) (internal quotation marks omitted). The reasonable person must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct, and thus overly apprehensive, nor insensitive to the seriousness of the circumstances. *United States v. Chavira*, 614 F.3d 127, 133 (5th Cir. 2010).

While there exists a public safety exception to the *Miranda* warning, police officers cannot rely on this exception once the danger inherent in a confrontation has passed. *United States v. Green*, 388 Fed. Appx. 375, 379 (5th Cir. 2010) (citing *United States v. Brathwaite*, 458 F.3d 376, 382, n.8 (5th Cir. 2006)) (holding that public safety exception did not apply when agents—who were in the process of executing a search warrant, had performed two sweeps of the house, and had both occupants of the house in handcuffs—repeatedly asked "Are there any guns in the house?" without first *Mirandizing* suspect).

It is clear that the officers in this case should have *Mirandized* Defendant long before any discussion of the firearm began. Defendant could have reasonably believed he was in custody when he was handcuffed on the ground and Officer Ray told dispatch he was "taking one into custody." Ex. 5 at 3, l.2.

The Government argues that the public safety exception applies, but it is evident that the situation had calmed down significantly before any incriminating statements were made. Officers had full control of the residence when they stopped to turn down the volume on the television in order to continue their conversation with Defendant. Ex.5 at 4, l.6. *Compare Fleming v. Collins*, 954 F.2d 1109, 1110 (5th Cir. 1992) (holding that public safety exception applied because concern for the officers' safety in the confusing aftermath of a botched bank robbery excused the officers' failure to read *Miranda* warnings when they came upon a man pointing a pistol at another man (who ultimately proved to the defendant) in an open field near the bank). At this point, there was no evidence of the presence of a firearm and both officers testified that they were not aware of any alleged presence of a firearm. *Compare New York v. Quarles*, 467 U.S. 649, 657, 104 S. Ct. 2626, 81 L. Ed.2d 550 (U.S. 1984) (holding public safety exception to *Miranda* applied when police were informed by a woman that she had just been raped and her assailant, carrying a gun, had entered a nearby supermarket).

The Government argues that the public safety exception found in *United States v. Castellana*, 500 F.2d 325 (5th Cir. 1974) is applicable to the facts before the Court; however, the officers in *Castellana* had a search warrant for suspected gambling, never handcuffed or arrested the defendant, and asked the defendant specifically if there were "any weapons within reach." *Id.* at 326. The court in *Castellana* notes that the "safety of the operation was [the] primary concern [...] and the very form

of [the] first inquiry – weapons within reach – shows it was limited to this proper concern." *Id.* In the present case, in the numerous times that the officers asked Defendant about the presence of guns, they always asked if there were any "in the house." Furthermore, when Defendant finally admitted there was a pistol "in a safe place," the officers continued to ask for its specific location. Ex. 3 at 5, ll.9-12; Ex. 5 at 8, l.8-12. The court in *Castellana* further states that "[n]o rational investigatory purpose could have prompted such a question about premises which the agents were already authorized to, intended to, and did search." *Castellana*, 500 F.2d at 326. As the Court has already discussed, Officer Rimpel had, at this point, both conducted and concluded a legitimate protective sweep.

Therefore, because Defendant was not *Mirandized* prior to the custodial interrogation, the Court finds that any statements and resulting evidence, including the firearm, were improperly obtained.

## RECOMMENDATION

For the reasons set forth above, the Court recommends that Defendant's Motion to Suppress (Dkt. 18) be DENIED as to the illegal drugs, cash, scales, and drug paraphernalia found in plain view in Defendant's apartment but GRANTED as to the firearm found and any statements made after Defendant was handcuffed and before he was ultimately *Mirandized*.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(c).

Failure to file written objections to the proposed findings and recommendations contained in this report within the time period set forth above shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 9th day of May, 2011.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE